**SAFEWAY STORES, INCORPORATED**

v.

**SAFEWAY INSURANCE COMPANY.**

No. 79–542–B.

United States District Court,
M.D. Louisiana.

May 9, 1985.

W.S. McKenzie, T/A, Nancy C. Tyler, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., W. Robert Buxton, Robert H. Sloss, Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff.

Victor A. Sachse, III, Breazeale, Sachse & Wilson, Baton Rouge, La., Jay G. McMains, Robert Parrillo, Michael J. O'Halloran, Parillo, Weiss & Moss, Chicago, Ill., for defendant.

POLOZOLA, District Judge:

Safeway Stores, Incorporated has filed this suit[1] seeking to enjoin Safeway Insurance Company from infringing its registered service mark "Safeway."[2] Safeway Insurance Company has denied any liability to the plaintiff and in addition, has filed a counterclaim which seeks injunctive and monetary relief.

## I. Background of Dispute

This action was brought by Safeway Stores under the Lanham Act, 15 U.S.C. §§ 1051 et seq.,[3] and the anti-dilution statutes of the states of Florida and Illinois.[4] Safeway Stores contends that the use of its service mark "Safeway" by the defendant is likely to cause consumer confusion. The plaintiff also contends that it is entitled to injunctive relief under the anti-dilution statutes of Florida and Illinois because the use of its mark or trade name by the defendant creates a likelihood of injury to the plaintiff's business reputation and dilutes the distinctive quality of its mark or name even though there is no consumer confusion. Safeway Insurance Company contends that its use of the name Safeway is not a violation of the Lanham Act because it does not cause consumer confusion. Safeway Insurance also contends plaintiff's claim is barred by the doctrines of laches and abandonment. In addition, Safeway Insurance Company has filed six counterclaims against Safeway Stores. Five of these counterclaims were based on federal law and one was based on a Louisiana statute.[5] In its first counterclaim, Safeway Insurance contends that if the Court finds that there is likelihood of confusion if the name Safeway is used by both parties to this suit, then it is entitled to an injunction under federal commerce law barring Safeway Stores from using the name in those markets where Safeway Insurance adopted or used the name prior to Safeway Stores. The second counterclaim seeks cancellation of Safeway Stores' federal service mark because of alleged misrepresentations made to the United States Patent Office when the service mark was applied for in 1960–1961.[6] Safeway Insurance asserts a cause of action under 15 U.S.C. § 1120 in its third counterclaim[7] and seeks attorney's fees for defending this action in its fourth counterclaim.[8] Safeway Insurance Company's fifth counterclaim is based on 15 U.S.C. § 1125.

## II. The Court's Decision

For reasons which follow the Court finds that the use of the name Safeway by Safe-

---

1. This Court has jurisdiction under 28 U.S.C. § 1332, § 1338 and 15 U.S.C. § 1121.

2. Plaintiff dismissed its claim for monetary damages prior to trial.

3. Safeway Stores seeks relief under 15 U.S.C. § 1114(1) and Section 1125(a). Although the Safeway Insurance contends that plaintiff failed to allege a violation of Section 1125(a), plaintiff's trial brief specifically urges a violation of this section. Therefore, the Court will consider plaintiff's claim under Section 1125(a). These statutes will be set forth in pertinent part later in this opinion.

4. *Fla. Stat.* § 495.151 and *Ill.Ann.Stat.* ch. 140, ¶ 22, § 15 (Smith-Hurd Supp.1984).

5. Safeway Insurance Company has dismissed its counterclaim filed under the Louisiana Unfair Trade Practices Act.

6. This claim is brought under 15 U.S.C. § 1064(c).

7. Safeway Insurance contends that the alleged false and fraudulent facts which dictate cancellation of Safeway Store's registration entitled it to recover on its counterclaim under § 1120.

8. The claim for attorney's fees is based upon 15 U.S.C. § 1117.

way Insurance Company is not likely to cause consumer confusion. The Court also finds no violation of the anti-dilution statutes of Florida and Illinois. Thus, the suit filed by Safeway Stores against Safeway Insurance must be dismissed with prejudice. The Court further finds that the five counterclaims asserted by Safeway Insurance are without merit and must also be dismissed with prejudice.

## III. Findings of Fact

The Court now turns to a discussion of the facts and legal issues involved in this case.

### A. Stipulated Facts

The parties have stipulated to the following facts in the pretrial order filed with the Court:[9]

*Established Facts:*

(A) Plaintiff, Safeway Stores, Incorporated, is a Maryland corporation with its principal place of business in California.

(B) Defendant, Safeway Insurance Company, is an Illinois insurance company with its principal place of business in Illinois.

(C) Defendant is in the insurance business presently qualified to do business in either as an admitted insuror [sic] or surplus line carrier in the states of Arizona, Florida, Illinois, Louisiana, Texas and Nevada.

(D) Defendant, Safeway Insurance Company, is presently writing insurance business in the states of Illinois, Florida, and Louisiana.

(E) Plaintiff, Safeway Stores, Incorporated, has registered the service mark Safeway with the United States Patent and Trademark Office as service mark registration No. 721,716.

(F) Plaintiff has registered its mark under the laws of the states of Washington, Louisiana, Arizona, Florida, and Nevada, among others.

(G) Plaintiff is a supermarket chain selling groceries and other goods and services based in Oakland, California, maintaining at least one retail store in the following states:

Alaska, Arizona, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Idaho, Iowa, Kansas, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Carolina, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, Washington and Wyoming.

Plaintiff also has locations in Canada and other foreign countries.

(H) Defendant is an insurance company selling auto casualty insurance in the State of Illinois. Defendant also sells auto casualty insurance in the States of Florida and Louisiana. Defendant sells only as a surplus line insurer in Louisiana.

(I) Plaintiff does not operate any store or maintain any office in the State of Illinois. Plaintiff has no present plans to expand in the State of Illinois.

(J) Plaintiff presently has no retail stores in the State of Florida. Plaintiff does maintain an office for the purpose of purchasing produce in the State of Florida.

(K) Plaintiff has 11 stores in the State of Louisiana. These stores are located in or near Monroe (4), West Monroe (2), Bastrop (2), Ruston (2) and Minden (1).

(L) In Louisiana, defendant sells through an employee located in Lafayette, Louisiana.

(M) In Florida, defendant sells through an independent agent located in Miami, Florida.

(N) In Illinois, defendant sells through independent agents in various locations.

(O) Plaintiff adopted the name "Safeway" in 1925 and began using it in 1925 or 1926.

(P) Safeway Mutual Insurance Company was organized, incorporated and licensed by the Illinois Department of Insurance as a mutual company on August 31, 1959.

(Q) The assets of Safeway Mutual Insurance Company were sold on Decem-

---

**9.** *See* document number 82 in the pleadings, pages 6–8.

ber 28, 1962, and its name changed to Trans-World Mutual Insurance Company.

(R) Safeway Insurance Company was chartered in Illinois as a new company on August 28, 1962.

(S) William Parrillo was a principal in both Safeway Mutual Insurance Company and Safeway Insurance Company.

(T) At the present time the defendant conducts no business under the name "Safeway" other than the sale of auto insurance.

(U) Plaintiff has no present plans to write or market insurance under its name to the public, and defendant has no present intention to enter the business of retail grocery or drug sales.

## B. The Court's Findings of Facts

In addition to the stipulated facts set forth above, the Court makes the following additional findings of fact:

Safeway Stores is a Maryland corporation with its principal place of business in Oakland, California. It is one of the largest food retailers in the United States. The plaintiff sells all goods normally expected of a grocery store including food items, non-prescription drugs, food accessories, some personal items and a variety of other merchandise. In its Super Store operation, plaintiff has a pharmacy which sells prescription drugs and other items. Plaintiff has approximately 1,900 retail stores in 25 states, including Louisiana, Arizona, Nevada, Washington, Mississippi and Texas.[10] There are no Safeway Stores in Illinois or Florida. All of the plaintiff's stores display the mark "Safeway" and the associat-ed large red "S" logo.[11] Safeway Stores also has approximately 2,000 truck tractors and over 4,000 truck trailers, all of which bear the name and logo of Safeway Stores. These trucks are driven millions of miles per year, particularly in Texas, Arizona, Mississippi, Nevada, Washington and Washington, D.C.[12]

Safeway Stores had an annual advertising budget of $128 million in 1982, most of which was spent on radio, newspaper and television advertising. All advertising features the name "Safeway" or its logo. Some of its advertising features only the "S" logo as is depicted in plaintiff's exhibit 43(B). The name and logo are also set forth on two billion grocery bags per year. A large part of plaintiff's advertising budget is spent on co-op advertising,[13] and much of plaintiff's advertising is heavily product oriented.

The plaintiff maintains large stores at convenient locations to serve its customers. The stores are prominently identified as Safeway Stores.

Safeway Stores does not sell any type of insurance at its stores and as of the time the suit had not decided on any firm plans to sell insurance in the future through its retail grocery outlets.

Safeway Insurance is an Illinois corporation with its principal place of business in Chicago. It is exclusively in the business of selling automobile insurance, including casualty, collision, comprehensive and uninsured motorist's coverage. At the time of the trial, Safeway Insurance Company was qualified to do business in Illinois, Louisiana,[14] Florida, Texas, Arizona, and Neva-

---

**10.** There are approximately eleven Safeway Stores in Louisiana. Most of these stores are located in the northern part of the state. *See* stipulated fact K above.

**11.** Copies of exhibits depicting the name and logo of Safeway Stores and Safeway Insurance Company are set forth in the appendix to this opinion. *See also:* plaintiff's exhibits 11, 13A, 13B, 13C, 13D, 37 and 43(b) and defendant's exhibit 2.

**12.** Safeway trucks also go to Florida, Louisiana, Illinois, Alabama and Georgia, but not as fre-quently because most of the trucking in these states is done by hired trucks.

**13.** According to the testimony, co-op advertising, in the retail grocery market is a process in which manufacturers of various grocery and related products will participate in the cost of advertising because the advertisement and sale of the product works to the mutual benefit of both the retailer and the manufacturer.

**14.** Safeway Insurance Company sells insurance only as a surplus line insurer in Louisiana.

da.[15] All of defendant's insurance sales are conducted through independent insurance agencies or brokers. No sales are made directly to the public by Safeway Insurance Company's employees or managing general agents.[16] The defendant has no advertising budget, and does no advertising. Safeway Insurance Company attempts to promote and market its insurance packages to various independent agents. The defendant has a home office in Chicago and small offices in Louisiana and Texas. These offices are properly marked with the Safeway Insurance Company sign.[17] Defendant does no outdoor advertising. Because of its marketing approach, which differs substantially from the plaintiff's marketing approach, the defendant is not concerned with the convenience and location of its offices.[18]

Safeway Insurance Company is not in the business of selling groceries and does not intend to enter the grocery business.

Safeway Stores has used the name "Safeway" since March 17, 1925 and has been qualified to do business under the "Safeway" name in every state in the United States since the 1940's. Safeway Stores registered "Safeway" as a service mark in the United States Patent Office on September 16, 1961.[19] In 1945, Safeway Stores began to register "Safeway" as a trademark on various products in the United States Patent Office.[20] Safeway Stores also registered its name under trademark registration statutes of Louisiana and Florida, among other states.

Safeway Insurance Company through its predecessor began using the words "safe" and "way" in 1959. The words "safe in every way" were also used with the defendant's name and are included on its stationery.[21] Safeway Insurance Company was chartered as a new company in Illinois on August 28, 1962. It continues to use the slogan "safe in every way" on its stationery.

■ The Court fails to find any fraud on the part of Safeway Stores in registering its service mark. The affidavit submitted by the plaintiff pursuant to 15 U.S.C. § 1051(a)(1) stated that no other person or company had the right to use the mark in commerce in any form likely to cause confusion, mistake or to deceive. The Court has concluded in this case that the use of the name by Safeway Stores and Safeway Insurance would not likely cause confusion. The Court finds that Safeway Stores acted in good faith and properly and legitimately obtained its service mark. This conclusion by the Court does not mean that the Court has found that Safeway Stores was the first to use the combination of the English words "safe" and "way" in connection with its operation in interstate commerce. The word "Safeway" is a combination of two English words, "safe" and "way." It is reasonable for the Court to conclude that the word "Safeway" does not in and of itself particularly connote anything to do

---

**15.** Applications have been filed on behalf of Safeway Insurance Company to do business in Mississippi, Alabama and Georgia. The state of California refused to allow Safeway Insurance Company to conduct business in California after Safeway Stores objected. The defendant also withdrew its request to do business in Washington after plaintiff filed suit there.

**16.** It is possible that an isolated sale was made to the public, but the defendant's sales policy is to work through independent agents and brokers. In Illinois, defendant sells through independent agents and brokers, while in Florida, it sells insurance through a managing general agent. Safeway Insurance has its own employees in Louisiana and Texas, whose function is to promote defendant's insurance to independent agents who sell to the public.

**17.** A copy of the logo and a sample of Safeway Insurance Company's stationery is set forth in the appendix. See note 10, supra.

**18.** The plaintiff uses a "pull strategy" and the defendant a "push strategy" in their marketing approaches. In the former, advertising is directed to the public, while in the latter, there is no advertising directed to the public. Incentives are given to the people selling the insurance to push defendant's insurance.

**19.** The service mark registration is for "retail grocery services."

**20.** Plaintiff owns over forty separate trademark registrations of "Safeway" on a variety of goods. The red "S" logo also appears on these goods.

**21.** See notes 10 and 17, supra.

with groceries per se. Finally, it is clear that the two companies involved in this case, one in the retail grocery business and the other in the insurance business, are not involved in the same or a related business.

## IV. Likelihood of Confusion

 For the plaintiff to prevail in this trademark infringement action, it must first be shown that plaintiff has "a protectable property right in the name it seeks to defend from use by others." *Bank of Texas v. Commerce Southwest,* 741 F.2d 785, 786 (5th Cir.1984); *Security Center v. First National Security Centers,* 750 F.2d 1295, 1298 (5th Cir.1985). Once plaintiff has established its mark's protectability, it must demonstrate infringement, *i.e.,* that use of its mark by the defendant "was likely to create confusion in the mind of the ordinary consumer as to the source, affiliation, or sponsorship of [the plaintiff's] service and product." *Conan Properties v. Conans Pizza,* 752 F.2d 145, 149 (5th Cir.1985); *Security Center,* 750 F.2d at 1298.[22] Numerous factors must be considered by the Court in determining whether a likelihood of confusion exists including: (1) the type of trademark alleged to have been infringed; (2) the similarity of design between the two marks; (3) similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising medium utilized; (6) the defendant's intent; (7) evidence of actual confusion;[23] (8) degree of care exercised by purchasers;[24] and, (9) diversity of products or services offered by the parties.[25] No one of the factors set forth above is dispositive.[26] Likelihood of confusion is a question of fact to be determined by the trial court. *Falcon Rice Mill,* 725 F.2d at 344; *Sun Banks of Florida v. Sun Federal Savings & Loan Association,* 651 F.2d 311, 314 (5th Cir.1981); *Amstar Corp. v. Domino's Pizza,* 615 F.2d 252, 258 (5th Cir.1980), *cert. denied* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

### 1. *Type of Mark*

 Whether plaintiff's mark meets the threshold of protectability depends upon the category of distinctiveness into which it fits. Four categories of marks have been recognized in the jurisprudence: generic, descriptive, suggestive and fanciful. A generic mark is one which constitutes the common descriptive name of a product or service. Such a mark is considered weak and is given no protection by the law.[27] At the opposite end of the spectrum is the fanciful mark, which is a mark which is "patently distinctive to consumers. It bears no relationship to the products or services to which it applies, but it readily identifies the producer."[28] Such a mark is considered strong and is widely protected.[29]

---

**22.** Unless protectability is shown, the question of likelihood of confusion is irrelevant. *Security Center v. First Nat'l Sec. Center,* 750 F.2d 1295, 1298 (5th Cir.1985); *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 425 (5th Cir.1984).

**23.** *Conan Properties v. Conans Pizza,* 752 F.2d 145, 149 (5th Cir.1985); *Armco v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1159 (5th Cir. 1982); *Roto-Rooter Corp. v. O'Neal,* 513 F.2d 44, 45 (5th Cir.1975).

**24.** *Falcon Rice Mill v. Community Rice Mill,* 725 F.2d 336, 345 n. 9 (5th Cir.1984); *Armco v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1160–61 (5th Cir.1982).

**25.** *Armco v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1161 (5th Cir.1982).

**26.** *Conan Properties v. Conans Pizza,* 752 F.2d 145, 150 (5th Cir.1985); *Falcon Rice Mill v. Community Rice Mill,* 725 F.2d 336, 345 n. 9

(5th Cir.1984); *Armco v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1160 (5th Cir.1982). In *Falcon,* the court noted: "These factors may not be relevant in every case.... The weight to be given to the various factors is a matter for the factfinder[.]" 725 F.2d at 345 n. 9.

**27.** *Park 'N Fly v. Dollar Park and Fly,* 469 U.S. 189, 105 S.Ct. 658, 661–62, 83 L.Ed.2d 582 (1985). A generic mark has been described as one which "any dunce could come up with." *Security Center v. First Nat'l Sec. Center,* 750 F.2d 1295, 1299 (5th Cir.1985).

**28.** *Louisiana World Expo. v. Logue,* 746 F.2d 1033, 1040 (5th Cir.1984).

**29.** *Amstar Corp. v. Domino's Pizza,* 615 F.2d 252, 259 (5th Cir.1980).

■ Somewhere in between the above marks fall those marks which are suggestive or descriptive. A descriptive mark is one which merely describes the qualities or characteristics of a product or service and is protectable only if it has acquired a secondary meaning.[30] A suggestive mark, one which "suggests ... a characteristic of the goods or services and requires an effort of the imagination by the consumer," is protectable without a showing of secondary meaning.[31]

■ The name "Safeway" is obviously neither fanciful nor generic. Furthermore, the words "safe" and "way" do not merely describe the characteristics of either groceries or insurance. Thus, the Court finds that plaintiff's mark is suggestive and, therefore, protectable.

■ The Court must now determine whether there has been an infringement of plaintiff's trademark. After full consideration of the evidence presented in this case and the jurisprudence summarized above, this Court finds that defendant's use of the mark "Safeway Insurance Company" presents no likelihood of confusion.

■ As noted above, the mark "Safeway" is a suggestive mark. Such a mark is not entitled to absolute protection as a fanciful mark would be. The amount of protection a mark is to receive is dependent upon the strength of the mark. In *Amstar*, the Fifth Circuit noted that the amount of third party use of the mark should be given considerable weight in determining its strength and the amount of protection which should be afforded. A weak mark given extensive third party use will not be protected outside the uses to which it is already put. *Amstar*, 615 F.2d at 259–60.

Evidence presented during the trial revealed a widespread use of the name "Safeway." Plaintiff's own enforcement files showed such uses as Safeway Insurance Agency and Safeway Finance Company,[32] while various telephone directories introduced by the defendant showed hundreds of uses of the name "Safeway." Consequently, plaintiff's mark should be given only limited protection outside the retail grocery arena.

2. *Similarity of Design*

■ "The similarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the mark." *Louisiana World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir.1984). Thus, it is necessary to consider the full names of the parties to determine whether the defendant's name invites or avoids confusion. *Security Center*, 750 F.2d at 1302; *Sun Banks*, 651 F.2d at 317–18; *Amstar*, 615 F.2d at 261.

In this case the full name of the plaintiff is "Safeway Stores, Inc.," but plaintiff's primary emphasis is now on its logo, a "soft square s" enclosed in a circle, with a lesser emphasis on the name "Safeway." Where the word "Safeway" is used by the plaintiff, it is used alone, *i.e.*, without the words "Stores, Inc." The defendant, on the other hand, always uses its full name, "Safeway Insurance Company," usually in conjunction with its logo, a block letter "s" on a typical insurance-type shield and its slogan "Safe in Every Way." [33] In *Security Center*, the court held that there was no confusion between the names "Security Center, Ltd." and "First National Security Centers" because the prefixed words "First National" minimized any potential confusion. Similarly, in this case the suffixed

---

**30.** *Park 'N Fly v. Dollar Park and Fly*, 469 U.S. 189, 105 S.Ct. 658, 662, 83 L.Ed.2d 582 (1985).

**31.** *Vision Center v. Opticks, Inc.* 596 F.2d 111, 115–16 (5th Cir.1979); *Security Center v. First Nat'l Sec. Center*, 750 F.2d 1295, 1298 (5th Cir. 1985).

**32.** It is interesting to note that there was no evidence presented to show that action has been

taken by the plaintiff against Safeway Finance or Safeway Insurance Agency.

**33.** Potential confusion between the two logos using the letter s is not an issue in this case. The plaintiff, in its complaint, does not seek to enjoin the use of defendant's logo, and no evidence relative to confusion caused by the logos was introduced.

words "Insurance Company" differentiate defendant's mark from that of plaintiff and thus minimizes any potential confusion.

### 3. *Similarity of Products*

The greater the similarity of products, the greater the potential for "the public's mistaken assumption of connexity between the providers." *Sun Banks*, 651 F.2d at 318. Where the products are dissimilar, it is appropriate to consider the possibility that one party will expand its line to include a similar product. *Falcon Rice Mill*, 725 F.2d at 345 n. 9; *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979). In this case, the plaintiff sells groceries [34] and the defendant sells insurance. The Court finds no similarity whatsoever between plaintiff's product and defendant's service.[35] Defendant's expert, Dr. Ronald Bush, testified that there is no product affinity, *i.e.*, association in the mind of the consuming public, between groceries and insurance. Further, there was no evidence presented that plaintiff intends to enter the insurance business or that defendant intends to enter the grocery business. Thus, this factor points toward a lack of confusion between plaintiff's and defendant's marks.

### 4. *Identity of Retail Outlets and Purchasers*

Another factor to be used in the determination of whether there is the likelihood of confusion is the identity of the retail outlets or service facilities and the identity of the purchasers of the product or services. *Sun Banks*, 651 F.2d at 318; *Amstar*, 615 F.2d at 262; *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir.1975); *American Foods v. Golden Flake, Inc.*, 312 F.2d 619, 624 (5th Cir.1963). These two criteria shall be discussed separately.

In this case, the parties have substantially different retail outlets. The plaintiff sells in stores directly to the public whereas the defendant sells to independent insurance brokers who thereafter sell to the public. Plaintiff is concerned about convenience in the location of its stores, while defendant is not. In the case of similar products, it has been held that the "inability to compare the products side by side ... may increase the likelihood of confusion." *Sun-Fun Products v. Suntan Research & Development*, 656 F.2d 186, 192 (5th Cir. 1981); *Louisiana World Exposition*, 746 F.2d at 1041. However, in those cases where there is little similarity in products, as here, the lack of the identity in the method in which the ultimate consumer gets the product is viewed as decreasing the likelihood of confusion. *Amstar*, 615 F.2d at 262.

The Court also finds that the predominant purchasers of the plaintiff's products and the defendant's products are dissimilar. Based upon expert testimony presented at the trial, the Court finds that: (1) the predominant purchasers of groceries are females, aged 20–50 and (2) the predominant purchasers of the defendant's insurance are insurance agents or males. This dissimilarity in the groups that purchase the parties' products tends to decrease the likelihood of confusion. *Armco v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159; *Sun Banks*, 651 F.2d at 318; *Amstar*, 615 F.2d at 262.

### 5. *Identity of Advertising Media Utilized*

The similarity of the advertising media used to promote the products of the parties is a factor to be considered in determining the likelihood of confusion because "[t]he greater the similarity in the campaigns, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exchange*, 628 F.2d 500, 506 (5th Cir.1980). In the present case, the plaintiff has established that it

---

**34.** Plaintiff also cashes checks, a function closely connected with the sale of groceries. Additionally, in some areas plaintiff sells money orders, collects utility bills and houses the automated teller machines of local banks. At present, however, all the plaintiff's stores are primarily grocery stores.

**35.** In *Amstar Corp. v. Domino's Pizza,* 615 F.2d 252, 261 (5th Cir.1980), the court noted that the only thing that plaintiff's product (sugar) and defendant's product (pizza) had in common was that they were both edible. Even that connexity does not exist in the instant case.

spends substantial revenue in advertising.[36] The plaintiff advertises in regional magazines, local and regional television as well as local newspapers using a form of advertising called "co-op" advertising. The defendant, on the other hand, does very little advertising.[37] It relies, instead, upon its managing general agents to promote and market automobile insurance packages to independent agents.[38] This dissimilarity in promoting the parties' products tends to negate the possibility of confusion. *Sun Banks*, 651 F.2d at 318; *Amstar*, 615 F.2d at 262; *American Foods*, 312 F.2d at 624.

### 6. Defendant's Intent

 The intent of the defendant in adopting the name "Safeway" is critical to the analysis of the likelihood of confusion. If the name was adopted with the intent to derive benefit from the reputation of the plaintiff, then the intent alone " 'may be sufficient to justify the inference that there is confusing similarity'." *Amstar*, 615 F.2d at 263, quoting *Restatement of Torts* § 729, Comment f (1938). There must be evidence, however, that the defendant sought to capitalize on the plaintiff's reputation, *Sun Banks*, 651 F.2d at 318, and there must be an attempt to "pass off" the defendant's goods as those of the plaintiff. *Amstar*, 615 F.2d at 263. Intent to deceive or to profit from confusion due to the sim-

ilarity may be inferred from acts of the defendant. *Falcon Rice*, 725 F.2d at 346.[39] In the present case, there was no evidence presented of the defendant's intent to pass its product off as the plaintiff's product. The plaintiff attempts to equate the defendant's knowledge [40] of the use of the name "Safeway" by the plaintiff with the intent to capitalize on another's reputation. Bad faith is not established by showing that the defendant knew or should have known that another was using this name, particularly in such unrelated fields as automobile insurance and groceries.[41]

### 7. Actual Confusion

 Although evidence of actual confusion is not a prerequisite to a finding that there is a likelihood of confusion,[42] it is, however, the best evidence of the likelihood of confusion. *Falcon Rice*, 725 F.2d at 345, quoting *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d at 704 (5th Cir.1981). In fact, a sufficient demonstration of actual confusion could sustain a finding of the likelihood of confusion even in the absence of other proof. *Falcon Rice*, 725 F.2d at 345.[43] However, the Fifth Circuit has given varying weight to evidence of actual confusion depending upon the type of person confused and the degree of such confusion.[44]

---

**36.** The plaintiff spent approximately $128 million on advertising in 1982.

**37.** The plaintiff contends that this should weigh heavily to indicate confusion because the defendant has built up no good will on its own and is, therefore, using the extensive advertising of the plaintiff to its benefit. Although there is support for this contention in *Louisiana World Expo. v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984), where the defendant did not advertise but "benefitted from the world wide advertising campaign put on by the Plaintiff," the *Louisiana World Exposition* case may be distinguished by a number of factors including (1) the products (World Exposition souvenirs) themselves were very similar and (2) the defendant admitted that his intent was to earn income by identifying his products with the fair sponsored by the plaintiff.

**38.** *See* notes 16 & 18, *supra*.

**39.** *See also Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 703–04 (5th Cir.1981).

**40.** Actual or constructive knowledge due to the registration of the service mark by plaintiff.

**41.** *See Amstar Corp. v. Domino's Pizza*, 615 F.2d 252, 263 (5th Cir.1980), where the defendant admitted that he was aware of "Domino" sugar at the time he picked the logo for his pizzeria and the Fifth Circuit found that this did not establish the requisite intent factor.

**42.** *Exxon Corp. v. Texas Motor Exchange*, 628 F.2d 500, 506 (5th Cir.1980); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir.1975).

**43.** *See also Frisch's Restaurants v. Elby's Big Boy*, 670 F.2d 642, 648 n. 5 (6th Cir.1982), *cert. denied* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982).

**44.** For instance, if such confusion is short lived or if it is the confusion of persons casually acquainted with the business, then such evidence is entitled to little weight. *Armstrong Cork Co. v. World Carpets*, 597 F.2d 496, 506

■ The evidence presented in this case is insufficient to establish that there is actual confusion among the parties' customers as to the source of the parties' products. The evidence of actual incidents of confusion[45] demonstrate isolated incidents of uncertainty as to whether there was a relationship between the plaintiff's and defendant's businesses. The number of transactions that have occurred since the defendant began using the name "Safeway" in 1962[46] make the amount of this past confusion negligible. In *Sun Banks,* the Fifth Circuit gave little weight to evidence of confusion of 15 individuals over a three year period. 651 F.2d at 319. Similarly, in *Amstar,* 615 F.2d at 263, the Court found that only three instances of actual confusion after nearly 15 years raised a presumption against the likelihood of confusion in the future. 615 F.2d at 263.

■ In addition to the evidence of the isolated incidents of confusion just discussed, the plaintiff has submitted a survey conducted by the Strategy Research Corporation of Miami, Florida. Survey evidence is admissible to demonstrate the possibility of the likelihood of confusion. *See Exxon,* 628 F.2d at 506–07; *Amstar,* 615 F.2d at 263–64; *Holiday Inns v. Holiday Out in America,* 481 F.2d 445, 447 (5th Cir.1973). The survey, patterned on the one submitted in *Exxon,* demonstrated that 70–75% of the individuals surveyed associated Safeway Insurance's name and logo with Safeway Grocery Stores in those cities where the plaintiff operated stores and 7–20% association in those cities where the plaintiff has never operated a store. While the results of this survey may indicate an elevated confusion level, there are defects in the survey which greatly reduce its probative value.

■ When analyzing the results of a survey to determine the probative value to give to a survey that has been admitted into evidence, the Court must first determine if the proper target universe has been selected. *King-Size, Inc. v. Frank's King Size Clothes,* 547 F.Supp. 1138, 1157–58 (S.D.Tex.1982). For a target universe to be appropriate, it must consist of individuals whose opinions are relevant to the present litigation. *Amstar,* 615 F.2d at 264. Therefore, for a universe to be proper it must include what is termed "a fair sampling" of people most likely to purchase the defendant's product. *Exxon,* 628 F.2d at 507. In the survey conducted on behalf of the plaintiff, it is difficult to ascertain what the target universe of the survey was, *i.e.,* to what population group were the results generated by the survey to be generalized. The plaintiff's survey included licensed drivers, 50% male and 50% female, with some random mixture regarding age and occupation, who were interviewed at two shopping centers in seven different cities. The questions raised by the survey are whether the results generated are to be generalized to all licensed drivers, to licensed drivers in the particular localities where the surveys were taken,[47] or to licensed drivers who shop at malls. In any event, the Court has difficulty in accepting "licensed drivers", the most comprehensive of the possible target universes, as a proper universe. Licensed drivers are not necessarily the purchasers of automobile insurance, a group whose opinions are relevant to this litigation. The survey in this case, as was previously mentioned, was patterned after the one submitted in *Exxon.* In that case, the Fifth Circuit accepted

---

(5th Cir.1979). On the other hand, the confusion of actual customers of the business has been deemed to be worthy of substantial weight. *Sun Banks of Fla. v. Sun Fed. Savings & Loan Ass'n,* 651 F.2d 311, 319 (5th Cir.1981).

**45.** This evidence may be summarized as follows: An attorney wrote a letter to Safeway Stores to inquire about automobile insurance on behalf of his client. Safeway Insurance Company's manager in Lafayette testified that four or five individuals had inquired if the in-

surance company was associated with the grocery store.

**46.** Actually the predecessor to Safeway Insurance Company began using the words "safe" and "way" in 1959. *See* text at note 20, *supra.*

**47.** The court has been presented with no evidence that the survey results were intended to apply only to such localities as there was no screening question to determine residency.

licensed drivers as a universe "not perfect" but "close enough." *Exxon*, 628 F.2d at 507. The present litigation, however, can be distinguished. In *Exxon*, the products in question were automotive supplies including gasoline and oil, which all licensed drivers at one time or another would probably have to purchase. However, in the present case, the purchase of automobile insurance is not necessarily the task of every licensed driver. In fact, there is evidence in the record that the predominant purchaser of automobile insurance is male. Fifty percent of the people interviewed for this survey were female, who, according to other evidence presented, are the predominant purchasers of plaintiff's products. In *Amstar*, the Court chastized a survey where the universe tested was comprised of individuals who purchased the plaintiff's products. In this case, as in *Amstar*, fifty percent of those interviewed "would have been repeatedly exposed to plaintiff's mark, but would have had little, if any, exposure to defendants' mark." *Amstar*, 615 F.2d at 264. In addition, 27.8% of those interviewed were under the age of 25, which could have included drivers as young as 15 or 16.[48] In short, the Court finds that plaintiff's survey does not present "any meaningful evidence of likelihood of confusion" and is "not probative of the presence or absence of confusion." *Amstar*, 615 F.2d at 264.

The Court, therefore, concludes that plaintiff's survey, though patterned after the survey accepted by the Fifth Circuit in *Exxon*, is entitled to little weight because the wrong universe was tested. After reviewing all of the evidence in this case, the Court finds that the isolated incidents of confusion previously discussed and the defective survey are insufficient evidence for this Court to find that there is actual confusion regarding the Safeway service mark.

8. *Degree of Care in Making the Purchase*

▮ Another factor to consider in determining the likelihood of confusion is the

degree of care and diligence of the buyer in making the purchase. *Falcon Rice Mill*, 725 F.2d at 345 n. 9; *Armco*, 693 F.2d at 1160–61. If the products are inexpensive or "impulse" items, the purchaser will normally expend less care in shopping for and selecting such products and, therefore, there would be an increase in the risk of confusion. *Sun Fun Products*, 656 F.2d at 191–92; and *Security Centers*, 750 F.2d at 1302 n. 9. Automobile insurance is a serious and, in many instances, a costly purchase. Potential customers would be more likely to investigate thoroughly before making such a purchase, thereby reducing the likelihood that such customers would be misled by the similarity of the names of the plaintiff's and defendant's companies. Furthermore, as was previously noted in this case, defendant's manner of selling its insurance through independent agents and its lack of advertising reduces substantially the risk of confusion between Safeway Stores and Safeway Insurance Company.

9. *Diversification*

The last factor to be considered by the Court is the extent to which the plaintiff's company has diversified. *Armco*, 693 F.2d at 1161. Diversification would make it more likely that the non-diversified company's products would be associated with the diversified company, even if the two companies were not in direct competition. *Armco*, 693 F.2d at 1161. No evidence as to the plaintiff's diversification outside of the field of groceries was presented. The defendant's business is limited to insurance. Therefore, the Court finds that this lack of diversification also weighs heavily in favor of finding no likelihood of confusion.

V. Dilution

▮ The plaintiff also contends that it is entitled to injunctive relief under the anti-dilution statutes of Florida and Illi-

---

**48.** The Court believes these young drivers would not normally purchase automobile insurance, although they were licensed drivers and would inevitably purchase automotive supplies of the nature in the *Exxon* case.

nois[49] because the use of its mark or trade name by the defendant creates a likelihood of injury to the plaintiff's business reputation and dilutes the distinctive quality of its mark or name even though there is no consumer confusion. These anti-dilution statutes protect against dilution of the distinct quality of plaintiff's trademark even in the absence of competition between the parties or confusion as to the source of goods or services. Dilution occurs "where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark." *Holiday Inns*, 481 F.2d at 450; *Amstar*, 615 F.2d at 265. The concept is not applicable in this situation, however, because it has been determined that the marks themselves are not confusing, defendant's use of the name Safeway Insurance Company will not mislead or confuse the public, and will not cause plaintiff's mark to become a weak mark. While plaintiff is entitled to protection from other users of the name "Safeway" in the grocery or related fields, it is not entitled to the same protection in unrelated fields. Plaintiff does not operate any stores in Illinois and does not have retail stores selling items in Florida. Therefore, the Court finds that plaintiff's claims under the Florida and Illinois anti-dilution statutes are without merit. *See Abner's Beef House Corp. v. Abner's International*, 227 So.2d 865 (Fla.1969); *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705 (7th Cir. 1972).

## VI. Evidentiary Rulings

During the course of the trial, the Court took under advisement several rulings on evidentiary matters.[50] The Court finds that the following exhibits are relevant to this action and should be admitted into evidence:[51] P-3, P-4, P-10, P-50-1 and P-50-2-6, and P-53-A-G,[52] D-4 and D-31. The weight given to each of these exhibits is inherent in the facts previously found by the Court. The Court did not rely on or quote from those portions of the depositions referred to in footnote 50. Therefore, the Court finds they are not relevant and hereby sustains the plaintiff's objection thereto.

## VII. Conclusion

Plaintiff has failed to prove a violation of the Lanham Trade-Mark Act and the anti-dilution statutes of Illinois and Florida. Thus, plaintiff's suit must be dismissed with prejudice. The defendant has failed to prove its counterclaims asserted against the plaintiff. Thus, defendant's counterclaims must be dismissed with prejudice. The Court notes in closing that all of the claims, contentions and defenses raised by all parties have been considered by the Court whether or not specifically mentioned in this opinion.

Therefore:

IT IS ORDERED that the suit filed by Safeway Stores, Inc. against Safeway Insurance Company be, and it is hereby DISMISSED with prejudice.

IT IS FURTHER ORDERED that the counterclaims filed by Safeway Insurance Company against Safeway Stores, Inc. be, and each is hereby DISMISSED with prejudice.

Judgment shall be entered accordingly.

---

**49.** *See note 4, supra.*

**50.** The Court took under advisement the admissibility of the following exhibits: P-3, 4, 10, 50-1, 50-2-6, 53-A to G, D-4, D-31. Objections made to portions of the depositions of Messrs. Dale, Horton, Stanton and Tobin; D 21, 23, 25, and 26, respectively, were also taken under advisement.

**51.** See Rules 401-403 and Rules 702-705 of the Federal Rules of Evidence.

**52.** P-50-1, to-2-6, and 53-A-G pertain to surveys. The Court has previously discussed the weight to be given to the survey evidence at pages 1317-18 of the opinion.

1320

# SAFEWAY INSURANCE COMPANY

500 SOUTH RACINE AVENUE • CHICAGO, ILLINOIS 60607 • AREA 312/942-8800

SAFE IN EVERY WAY

DEFENDANT'S
EXHIBIT
2

PLAINTIFF'S
EXHIBIT
P-43B